No. 19,180.

Elmer F. Benway v. The National State Bank of
Boulder, as Conservator of Estate of Libbie Benway,
Ward; and Prudence Carrie Benway Hilty.

(357 P. [2d] 912)

Decided December 19, 1960.   Rehearing denied January 9, 1961.

Messrs. Lesher, Schmidt & Van Cise, for plaintiff in
error.

Mr. Sanford D. Coleman, for defendant in error Pru-
dence Hilty.

*In Department.*

Opinion by Mr. Justice Knauss.

The parties to this writ of error are here in inverse
order of their appearance in the trial court. Two sepa-
rate actions are here involved, each embracing the same
issues but referring to different parcels of real estate,
one designated as the Boulder, Colorado, property, the
other as the New York real estate. By consent both
actions were consolidated for trial. From a judgment

and decree in favor of plaintiff the defendant brings error.

The actions were commenced by Prudence Carrie Benway Hilty, to whom we will refer as Prudence, against The National State Bank of Boulder as Conservator of the estate of Libbie Benway, Ward, herein referred to as Libbie or grandmother, and Elmer F. Benway, whom we will designate as father or Elmer. The actions sought to have two deeds, by which Prudence conveyed to her grandmother the subject real estate, set aside as void because of undue influence and duress exerted on Prudence by her grandmother Libbie and her father Elmer in 1953. She also claimed that in 1955 because of undue influence exerted by her father, the grandmother deeded the properties involved to Elmer, reserving a life estate to the grandmother.

The trial court held for plaintiff on both sets of deeds, quieted plaintiff's title as a joint tenant in the Boulder property, and ordered reconveyances of the New York property to restore all titles to the status existing in 1948.

To outline briefly the factual background of this controversy, it is noted from the record that Elmer is the only son of Libbie Benway. He married and as the issue of that marriage twin girls, Patience and Prudence Benway, were born. Not long after the birth of the twins, their mother died and the babies were taken by Elmer's parents where they remained and were cared for by their grandmother. For a while Elmer made his home with his parents. He remarried and left Libbie's home, leaving the children with their grandmother. He was divorced from his second wife and in 1921 he again married. Two sons were born of this third union. Elmer moved to Wisconsin and visited his mother about once a year. At the time of the trial he was a widower.

In 1948 Libbie executed and had recorded a joint tenancy deed to the Boulder and New York properties to herself and Prudence. Witnesses testified that over

a period of years Libbie's attitude toward Elmer was one of hostility and that it was her desire that her property go to Prudence. Libbie was very strict in her supervision of the two grandchildren. In 1953 when Prudence was about thirty-eight years of age she contemplated marriage. Her grandmother was opposed and urged Elmer and several other persons to endeavor to dissuade Prudence from the marriage. At the grandmother's request attorney Reynolds of Boulder drew two deeds, one for the Boulder and the other for the New York property, for signature by Prudence. These deeds ran to the grandmother. Two days before the wedding Prudence signed the New York deed in the office of Reynolds, who testified that she was in a very distressed condition, tearful and emotional. In fact his evidence discloses that he was reluctant to have her sign either of the deeds, but did allow her to execute the deed to the New York property, refusing to allow her to sign the deed to the Boulder property.

Later after the wedding, Libbie asked Elmer to assist in having Prudence sign the conveyance of the Boulder property. Thereafter he took her downtown and let her off at Reynolds' office, but did not accompany her to the lawyer's suite. She returned and told Elmer that it was fixed up. Reynolds testified that at the time of the signing the second deed Prudence told him "that she was willing to sign it because if that would make her grandmother happy and would preserve her marriage that she wanted to do it." Reynolds said she was emotional and distraught, but he nevertheless allowed her to sign the conveyance. That he prepared the deeds at the insistence of Libbie.

The marriage of Prudence lasted only a few months. In April 1953 Elmer wrote Prudence, and after discussing the breakup of the marriage, expressed his satisfaction that the property was back in "grandma's" name. In 1956 Elmer visited his mother and discussed with her whether she would convey the farm in New York

to him. The farm was then rented and Libbie rejected his suggestion. During this conversation Libbie ran out of the house screaming hysterically. Her next door neighbor observed Libbie's actions, took her into her home and calmed her. The record discloses that Libbie on this occasion told her neighbor, "They're trying to take my property away from me"; that Elmer wanted to cease his employment as a salesman; that he wanted her farm; that she did not want him to have it because it was her only means of support. Libbie refused to go back to her home while Elmer was there. After he left the home Libbie returned. Elmer went to Wisconsin where he continued to reside. Other witnesses testified as to Libbie's hostility toward her son.

In March 1955 Elmer visited his mother. He testified that he employed Mr. Fitzgerald, a Boulder lawyer, to draw the deeds from Libbie to himself. It appears from the record that at that time Libbie was eighty-six years of age, enfeebled in health, hard of hearing, suffering from impaired eye sight and high blood pressure. A physician testified that in his opinion she was then a mental incompetent. Fitzgerald spent more than an hour at the home of Libbie before she executed the conveyances. He was a stranger to both Libbie and Elmer prior to his employment by Elmer.

Reynolds testified that during late March or early April 1955 Libbie called; that she was emotionally upset, said she had executed some documents, the nature of which she did not know, and was afraid she had done something "awfully" wrong. Reynolds discovered the deed had been recorded and talked to Mr. Fitzgerald. He reported to Libbie advising her of what she had done. Correspondence followed between the lawyers, Prudence and Elmer.

During much of the period here involved Patience was suffering from a mental illness and was being treated in the Colorado Psychopathic Hospital or the Colorado State Hospital. The record further discloses that ·Pru-

dence cared for and nursed Libbie and assisted financially in maintaining the home.

On May 17, 1957, Libbie was adjudged a mental incompetent and committed to the state hospital at Pueblo.

The foregoing is the picture presented by the testimony of some nine witnesses at the trial.

The sole question is whether there was sufficient competent evidence in the record to sustain the findings and decree of the trial court. A careful reading of the record submitted, including the numerous exhibits, persuades us that the evidence was ample to sustain the findings, and that the trial court correctly applied the law as announced in *Eshe v. Eshe,* 127 Colo. 303, 255 P. (2d) 753; *Moedy v. Moedy,* 130 Colo. 464, 276 P. (2d) 563; and *Martinez v. Salazar,* 137 Colo. 17, 320 P. (2d) 335.

The judgment is affirmed.

MR. JUSTICE FRANTZ and MR. JUSTICE DOYLE concur.